Good morning. Before we start, I'd like to, on behalf of myself and Judge Fuentes, thank Judge Schiller for sitting with us, one of the preeminent jurists in the, not just the Eastern District of Pennsylvania, but in the District Court of the United States. So thank you very much for agreeing to help us out. I think he got tired of watching us. I want that recording. I want to send it to my kids. The other ones have told me to say it. The first case is Lupyan, is that correct? Yes. Okay. May it please the court, counsel. Attorney Adam Grzelski arguing on behalf of the appellant, Lisa Lupyan. This case... I said Lupyan, you said it was correct, but it wasn't correct. It's Lupyan. Lupyan. Lupyan. Did she pay her fee? Get the name right. It's a contingent case, so we'll see. Okay. I respectfully... Is that a plea for mercy? No. I respectfully reserve three minutes for rebuttal on this issue. Maybe you can help me with the prejudice issue here. Your client got all of the 90-day leave she would have been entitled to under the Act. So even if you can prevail on the notice issue, how can you show, and just forgetting the retaliation for a second, that's different, how can you show prejudice? The issue in this case, in her circumstance, was that she had some panic issues, some depression issues, and she has stated that she would have been able to restructure her therapy. This wasn't like she was returning from a... Yeah, but the doctor's note said that she could return at a date that was about two weeks, I think, after the leave expired. Initially. Initially, she actually had her leave that I believe ran until October of the next year. So she was well ahead of schedule in that regard. Again, this wasn't an issue where she was out with a broken leg or something, and the doctor specifically said, you can't be on your feet. You're completely precluded from working. This was a mental health issue that she certainly could have restructured the way she was getting her treatment if she knew that she had to be back by a certain date. The ballpark figure that she got from her doctor was not in regard to any notice that she had that she had to be back in a certain time. In fact, our position is that she was never told what date her leave would expire. In fact, her rights weren't explicitly explained to her, so she didn't have that opportunity to restructure her therapy in a way... How detailed is the notice in the handbook? I know she said she didn't receive that, but it's in the file and it's signed that she did receive it. She did sign a receipt of the handbook, and this was addressed during our first summary judgment in front of the district court, that a handbook notice was not sufficient receipt under the law that you have to actually receive the written notice. She received the handbook when she began working. This was a number of years before this issue even arose. So to hold her to understand exactly that she had 12 weeks based upon a handbook that she read a few years ago, I don't think is sufficient under the law, and certainly in her case wasn't sufficient because she was not aware when she needed to return. Did the employer comply with the statute and send notice? That's the issue that we have right now. Our contention is that she never received the letter in question that would have shown her notice. And the evidence that's been presented on this issue, on one hand from the employer, was a testimony from the human resources individual who submitted an affidavit, I believe it was a little less than four years after the date, saying, oh yes, I remember stuffing and placing this letter into our company. Why doesn't that comply with the statute? The statute just says written notice. Well, our contention is, number one, that the employer hasn't proven as a matter of law that they actually mailed this document, and number two, they have not proven as a matter of law that our client actually received it. But they're entitled to presumptions, aren't they? Well, they're entitled to presumptions as long as they submit sufficient evidence to entitle them to that presumption. One of the first arguments that we've been making is that the employer simply submitted self-serving testimony from one individual. We cited a number of cases in our briefs, not from the Third Circuit, but from the Ninth Circuit, the Eighth Circuit, and the Tenth Circuit. When you say self-serving, I tend to think a lot of evidence is self-serving, but they did what they're supposed to do. They said, all right, we prepared the notice, put it in an envelope, took it to the mail room, the mail room sent it out, and there's a presumption of receipt. Well, and, Your Honor, at trial, that is certainly evidence that can be used to establish that presumption, but at the same time, a jury would be free to reject that testimony, stating that an individual four years after the fact simply can say, oh, yeah, I put that letter in the mail. But the district court felt that that was the presumption was not rebutted and ruled in favor of the employer. District court did do that. Again, our first contention is that we don't even get to the issue of presumption of receipt because I don't believe that they satisfied as a matter of law that they actually mailed the notice in question. But even in regards to the presumption of receipt, this Court pointed us to the Cappuccio case that was recently decided by the Third Circuit. In that case, it did deal with the Truth in Lending Act, but the Truth in Lending Act simply was the statute that gave rise to the presumption of receipt itself. It essentially said when an individual signed an acknowledgment that they received something, that that created a presumption of receipt. But the Truth in Lending Act in that case, well, in general, but the Court noted in that case. The jury didn't even have that because the acknowledgment of receipt, which is bizarre. In her file, there's the acknowledgment of receipt form that's not signed by her. It was not signed. And certainly the appellees have made the argument that, well, that's our client's fault. That's not his client's responsibility to make sure that she signs it. But at the same time, it calls into question why the employer wouldn't pursue that issue. They don't have this presumption of receipt. They didn't have a certified mailing, a postmark, anything to show that they actually sent this out. Why wouldn't they take that extra step? How would they have a postmark? I mentioned that in a brief, but how would they have a postmark? A postmark goes on the envelope that goes to the recipient. It certainly could ask for a copy or a certified mailing receipt. This is a very important document informing somebody of their federal rights. Do you know that not many companies send out certified letters about those rights? I understand they might not, and I'm not saying that their own testimony isn't. They're not required to. Oh, it's not required. It certainly isn't. And their own testimony might be sufficient in front of the ultimate fact finder to decide that, yes, we find this individual credible, we find her recollection credible, and, yes, we find that the employer did mail the receipt and thus is entitled to the rebuttable presumption. What's the status? The status of our law is that the employer here did what was required by the law, isn't it? If they prove that they actually mailed it. But they provided what is necessary, the business records. They provided the, by either affidavit or testimony, that the notice was prepared. It was put in an envelope. It was taken to the mail room. The mail room person showed up and said, when these things are done, I put it in the postal service. And they have some. And then they're entitled to a presumption of delivery. If those facts are proven or accepted by the ultimate fact finder. Were they disputed? They were disputed. Our client has disputed that she received it, and I think that calls into question whether or not it actually was received. But that doesn't mean it wasn't sent, does it? It doesn't, but it also doesn't mean that it was sent. A jury certainly is free to reject, again, testimony from somebody less than four years ago saying, I'm in charge of human resources. I'm in charge of all the mailing for our company. But I remember mailing this specific letter. How big is the company? How many employees at this location? Offhand, I'm not sure. Five, 500? The actual school in question is located in western Pennsylvania, but the human resources department where all this was happening was located out in California. So this was the actual individual who testified to mailing was the human resources manager from out in California. Is it the case, Mr. Gorzowski, that all an employee has to say is, I didn't get the notice? That means the case goes to trial. Is that the case? Well, it seems as though that is what the Capuccio Court was saying, that if you do get to the level where a presumption of receipt has been established, that the individual who was to receive that can rebut that presumption by presenting some type of evidence, some type of firsthand evidence that the receipt did not occur. And in this case — How is the statute the same, truth in lending as opposed to the FMLA? The statutory language that gives rise to the duty either to give notice or to receive notice, or the presumption that comes out of the mailing. How is the language different, or is it different? Well, there was no language regarding a presumption of receipt in the family medical leave act. This is — No, that comes out of the mailbox rule, but the language about notice, that's in the act. It is. And it states that an individual wants — that he or she is in need of family medical leave act leave. The employer is to mail the individual or otherwise give them notice. I'm missing the response here to what I thought was a question. What's the difference between the truth in lending and federal medical leave act for purposes of the notice? That's the question. The truth in lending act didn't — Is there a difference? I don't believe so. And I don't know if that's necessarily determinative in this case. Well, Capuccio doesn't help you if it's a different statute with a different requirement. Well, it's the requirement that — all the truth in lending act did in that case was give rise to the presumption of receipt, which is the same issue that we're dealing with. The question is what is it within the act that gave rise to that presumption, and is it the same language that exists in the FMLA? If it doesn't, then there may not be a presumption arising out of the FMLA. The language in Capuccio stated that it was a situation where a — I believe it was an individual who had taken out a loan, had to sign an acknowledgment that they received certain paperwork. And the truth in lending act said that when an individual signs that acknowledgment, that gives rise to a presumption of receipt. Now, there's no language in the family medical leave act about a presumption of receipt. It simply speaks to a taxpayer receiving written notice of their rights pursuant to the family medical leave act. The employer chose in this case, in Mrs. Lupien's case, to provide that notice via mail, which gave the — gave rise to the mailbox rule. But the Capuccio case didn't look at the truth in lending act any further for interpreting what that presumption of receipt meant. They looked to federal rule of civil procedure — or federal rule of evidence 301, which, if I could read a quote from it, states that the introduction of evidence to rebut a presumption destroys that presumption. The court interpreted that to mean in the situation when we're talking about an individual trying to overcome some type of presumption, the quote from the court was, the testimony of a borrower alone is sufficient to overcome truth in lending act presumption of receipt. What kind of notice is sufficient in your book? What the employer prepared in this case, the written notice outlining what the family medical leave act entails, when you began your leave, and when is the last date that you could return, that would be sufficient. We have never contested that the letter — I don't mean the contents of the notice, but the delivery of it. But supposing I sent an email? As long as our client would have confirmed that you received that email. That leaves it entirely up to your client. How can the employer satisfy the statute? Because every employee is going to say — every employee who wants a trial would just say, well, I didn't get it. I just didn't get it. So how can an employer come in and say, I have proved that I did what the statute requires me to do? Well, I think the first step at summary judgment would be to have a practice as an employer to prove as a matter of law that you've mailed something by, let's say, sending it out certified mail. So you have that receipt that you can point to and say, there is no question that this was sent out. Then I put the burden on the United States Postal Service to do their job and deliver it. Sounds like a miracle on 34th Street. But did you set a term for your bottle? I did. Okay. So we'll hear back from you. Okay. Thank you. Thank you. Good morning, Your Honors. Good morning. Counsel. My name is Jeff Balicki, and I represent the Appalachians, Corinthian Colleges, Inc. As we've been discussing here this morning, this case really revolves around whether or not Ms. Luffian has received notice of her FMLA rights, which we contend that she has. Well, part of it is that there's also a retaliation claim, which doesn't really turn on the notice issue. And for summary judgment, I understand it's your position that she would not have been rehired because of the drop-off in enrollment. The director of education said two things, I think, in the same sentence. He said that they have a practice of not having someone lose their job because of a drop-off of enrollment. But then he also said that they adjust their employee's number based upon enrollment, which makes sense. But how can both of those things be true, and why doesn't that give an issue of fact that gets her to the jury on retaliation? Well, Your Honor, the truth of the matter is that the company does not lay off employees because of a downturn in enrollment. That's different than what was presented in this case. She was effectively terminated because she had exhausted her FMLA rights, and she appeared to return to work two weeks after those rights had expired. She was no longer- You're putting the rabbit in the hat, and you're going back to the substantive issue. For a second, let's focus on the retaliation part of it. Let's assume that she could establish to a jury that, okay, she got notice of her leave. She stayed out longer than the time allowed under the Leave Act. But the company retaliated against her for exercising that right by not hiring her. She still got a retaliation claim, even if she can't make out her FMLA claim, her notice claim. Well, we don't see that as a retaliation claim. The reason, you know, the company could rely on the fact that she had exhausted her FMLA rights as a reason for terminating her. They could, and the jury could say that's pretext. The jury could say, well, that may be a reason for terminating her. It may be that they terminated her because she exercised her FMLA rights to begin with, because her position is that, see, you don't normally lay people off or terminate them, whatever term you want to put on that. If someone doesn't have a job, I don't think it matters whether they're furloughed or laid off or whatever. They're not getting a paycheck. Her position is that that happened to her because of the FMLA Act, because she took a leave. Well, Your Honor, there are cases that have discussed the fact that employers can consider the fact that an employee has exhausted their FMLA rights as a reason for termination, as long as they have other credible reasons as well, legitimate business reasons. Credible, legitimate. That's the key word, legitimate. Right. What if a jury were to hear this case and conclude that the reason here really is not the exhaustion of FMLA rights, but the fact that she took FMLA leave to begin with? Well, Your Honor, if that was the conclusion that a jury could determine that, then wouldn't every case where an employee was terminated because their FMLA rights have been exhausted would create a prima facie case of retaliation that could not be overcome? Well, no, not every case. Every case would have to go to trial. Every case where you have a contradiction, apparently a contradiction, maybe it can be explained, explanation that one of the reasons she wasn't retained was because there was a drop-off in enrollment and they decided not to keep her. That's on the record. There's also evidence to suggest that that, in fact, is not the practice of the company, that they don't terminate somebody because of a drop-off of enrollment. I don't know how that could be, but that is what's on the record. So why wouldn't that contradiction be enough to at least get you past summary judgment on retaliation? The difference is that she was no longer employed by the company. She was essentially an applicant for rehire. So they are looking at her, do we need to fill this position? Do we have a position to be filled? That's different than when you have a current existence. The minute she exhausted her FMLA rights, she was now an applicant for rehire? Essentially, that's what she constructively turns into. There's no requirement under FMLA that an employer send a notice to the employee telling them that they've been terminated. Often the employees never even return to work. Can you explain the conflicting explanation she was given for her termination? Conflicting in the sense that you didn't come back in time, number one, and number two, we have a drop in enrollment. I'm sorry, what was number two? We have a drop in enrollment. Right. Wasn't she told that we have a drop in enrollment and therefore we can't take you back? Actually, that is true. They had a drop in enrollment. They had reduced the ASM, Applied Science Management instructors, from five to four. Is it one reason or the other, or is it a matter of that she was given two different reasons for why she was terminated? She was given different reasons, not conflicting reasons. One, there was a drop off in enrollment of student population. Two, they had reduced the staff size from five to four. Three, they had reduced classes from, I think, three to two. So there was, you know, several things that were going on, and they had no position for her to fill. So there was no need to hire her back, if you will. Is it your position, had she not exhausted the FMI leave, she would never have been terminated? That is correct. Despite the fact that you had a drop off in enrollment, reduced classes, and everything else? As the company says, they don't lay off existing employees because of a downturn in enrollment. But they didn't fill that position for two more years until two years after the fact. How about the interference claim, the notice claim? The argument, of course, is your notice. She set up a question of fact for the jury. She said, I didn't get the notice. In accordance with Cappuccio, doesn't she win on that point? No, I don't believe that, Your Honor. I think Cappuccio has a greater standard of credibility than just a simple denial. If you look to Cappuccio, the court states — What page are you on? I'm sorry? What page? You were going to read something from the opinion. I was going to read the opinion you were. I was looking to Cappuccio. It says — From the opinion — I'm trying to find the page. On page 190 of the opinion, it states, Her testimony was also obviously based on her personal knowledge and was in no way conclusory. Accordingly, under Rule 301, her testimony would appear to be sufficient to burst the presumptions bubble, leaving the decision of whether to credit her testimony or that of E-Trade's witnesses to the jury. How is that different? How does that help you? How does that help us? Because what the court is saying, in my read of this opinion, is that her testimony, which was very factual, she testified that she went to the closing. She was there for more than 40 minutes, but the closing was fast and haphazard. All closings are fast and haphazard. Well, they're haphazard. They may not be fast. She testified credibly that she left that closing without any documents. So she didn't have the notices in her possession. She should have had two notices for each loan that she was applying for. I think she was applying for two loans. So she should have had four notices upon leaving. What would be similar in this case? I never got the notice. I went to the mailbox. I opened it up. It was empty. Is that what you wanted to say? She said she never got the notice. She said that she never received the notice. That is true. That's just a mere – That's as factual as you can get, isn't it? No, that's a conclusory self-serving statement. It's a typical Rule 301 factual statement that sets up a fact. It's not a legal conclusion. But the difference between – and, in fact, the difference between just a general denial and what's happened in Capucio. But, you know, the employer could help itself a lot. Sure could. Instead of going through that old mailbox rule and instead adopt what Judge Garth said in another case, Santana-Gonzalez, where, in fact, let me just point out that one sentence. He says, We now hold that strict evidentiary standard, strong presumption applies when a notice from an immigration – it's an immigration context, but it's really the same thing. It's a presumption. It has to do with notice – is sent by certified mail, and that a weaker presumption of receipt applies when the notice is sent by regular mail. So when I say you could certainly help yourself, you could avoid this problem by not using the regular mail and instead using, in fact, what your adversary says, certified mail, return receipt requested, because there's a paper trail. Your Honor, I understand that is absolutely correct from a practical point of view, but it's not required under the law. It's not required under the act. But that's what we've got to determine whether it is or not. Even if it's not absolutely required, I don't understand that maybe I'm missing something that can help me with how what she is saying here is different than what the borrower said in Capuccio. And I'm looking at 190 now, and the court said, even though it's a self-serving declaration in a sense, that in advance of their own legal claims, her testimony related directly to a material issue, in that case under the TLA claim. Here it relates directly to a material issue under the FMLA claim. She said, I didn't get it. That's not a conclusion. That's a statement that she's saying she didn't get it. And given that, why isn't that enough to rebut whatever the string of the mailbox presumption would be that would arise out of the proof of proper mailing? Why wouldn't that be enough to rebut that? And the jury can either believe or not believe that she got it. And we have more here because we've got an unsigned acknowledgement of receipt in the file which your own records corroborate her testimony. She's saying I didn't get it. Your records corroborate that because she never signed acknowledgement of receipt. Your Honor, the unsigned acknowledgement of receipt is nothing but an indication that she didn't sign it and send it back. And that's what you argue to the jury. That doesn't prove that she didn't receive the letter. You may be right. You argue that to the jury. We have – our argument is under the mailbox rule, which is a different standard than what's under Rule 301. Do you know how old that – I don't know. I'm asking you. Do you know how old that rule is, that mailbox rule? Over 120 years, according to the case law that I've read. Shortly after the Big Bang, that rule. That helps. That helps with my point because there have been so many changes in postal service and mail delivery service and electronic notifications, and I wonder if we should be a little bit more update. Well, the mailbox rule is still applied to it today, Your Honor. In fact, there's a – it's a non-precedential opinion, but it's from the Third Circuit, and it was Lipscomb versus Electronic Data Systems Corporation. The mailbox rule was applied in that case. That was a 2008 decision. So even though, yes, mailing procedures have changed over 100 years. You know, I'm sorry to cut you off. I think you might be right for ordinary business transactions, but this is a statute in which Congress has put in a specific requirement imposing obligations on employers, imposing obligations on lenders, and when Congress says, I want you to be sure to provide notice, shouldn't we be more certain that that notice gets to its intended target? Your Honor, you're talking TILA versus FMLA, but I failed to say. No, no, no, I'm not talking versus. I'm talking about Congress requiring that notification be made in a statute. And if Congress believes that this should be done that way, then they'll have to amend the act and make it that way. But for right now – But they didn't amend TILA, though. But I would like to conclude one point before we get too far away. On the Lipscomb case that I was citing as a non-precedential case, that was an FMLA case, a 2008 decision where the mailbox rule was applied successfully in an FMLA. Lipscomb? Lipscomb. There's a reason non-presidential cases are non-presidential, and maybe we need to clarify it. Because that seems to be in tension with both Gonzalez in the immigration context and with TILA in the truth and liberty context. In the remaining minute that I have, I would like to just point out that TILA is a remedial statute, that this Court has held that the presumption that's created by TILA is the weakest form possible. On the other hand, the mailbox rule is, in my opinion, a higher standard, and there must be an absence of clear evidence. In other words, the person against whom the mailbox rule is being imposed has to show by clear evidence that they did not actually receive the item. How do you show you didn't receive something? How is it possible? How in the world can I – someone comes in and says, McKee, I sent you something the other day. How in the world can I possibly prove I didn't get it, other than saying I didn't get it? Do I write security cameras on the house to show that whatever mail was deposited within the view of that security camera, it didn't have an envelope from my employer? How in the world do you prove you didn't receive something, other than saying I didn't get it? Your Honor, in a case that's been cited by both parties in this case, Carnithon v. The Ohio National Life Insurance Company, in that case it was a plaintiff who argued that he did not receive a notice of cancellation of his insurance coverages. How did he prove that? In addition, what circumstantial evidence did he have in addition to his general denial? He showed that the mailings for that insurance policy came to his place of business and that his procedure at his place of business was to have the secretary sort the mail into bills and non-bill items. She would then enter the bills into their computer system for his review and approval for payment. They were able to show that there was no entry into their computer system. In a business context, yes, but in the ordinary residential context where you don't have any business record fighting another business record. So he's basically relying upon something which is kind of a cousin of the mailbox rule, standard business conduct, to show that has this been received, my standard business conduct would have picked it up. It wasn't picked up in this case. It's very akin to the mailbox rule from the recipient's point of view. But from the point of view of the individual consumer, I don't know how you prove you didn't get something. But I think Judge Fuentes has a question that he wants to ask. I have a question on the second summary judgment motion, which was filed well beyond the period that was set forth by the district court without explaining why or providing any good cause. Could you comment on that? Your adversary says that was totally improper, wrong, and should not have been allowed. Your Honor, we felt that we had put in our original motion for summary judgment a good-faith affidavit of one of the employees to establish the mailbox rule. We raised the mailbox rule of defense as a part of our original motion for summary judgment. In fact, the court originally agreed with us. The court only changed its mind upon a motion for reconsideration by the appellant. It was the second summary judgment motion, wasn't it? You filed the second? We filed an amended motion for summary judgment just to attach two affidavits. One was from the mailing room supervisor, who explained all the procedures that the company undergoes for their mailing processes. And one was from the HR coordinator, who was responsible for sending the letter dated December 18, 2007, with the notice of FMLA rights to the appellant. And that was what the purpose of the second. How big is the company, Mr. Buchanan? Do you know how many employees they have? I know that you asked that question of the appellant. I think at the school where she worked, they probably have 80. Okay. But I may be speculating. It's a national company, isn't it? Yes, it's Corinthian Colleges, Inc. is a hoarding corporation, and they have various schools throughout the country that were acquired, such as WireTech, which is the school where she worked. Thank you. Thank you. You saved some time, I believe. Just to touch briefly on the retaliation issue, the appellees have repeatedly asserted, at least in their brief at this point, that Mrs. Lupien was let go pursuant to a – well, not let go. They say that there was a hiring freeze, and as you heard that she was terminated effective once she refused or failed to return within her FMLA time period that was allotted to her. And the position is that she was let go at that point and was essentially a new hire who would have been subject to this hiring freeze. This simply is not what their witnesses have testified to. If I could read from a deposition of the school president, Arthur Herman, he was asked, question, and Mrs. Lupien would not have been a hire, though, would she? Where are you reading from? This would be in Appendix Volume 3, page 7. Again, deposition testimony of Arthur Herman. Okay. Again, question, and Mrs. Lupien would not have been a hire, though, would she? She wouldn't have been a new hire. Answer, that is correct. Question, she would have been an employee on leave that was being brought back. Answer, sure, that's correct. So their own witnesses have provided evidence showing that she, in fact, was not terminated effective upon her failure to return within the 12 weeks. Are the damages that you seek in both of these claims, interference and retaliation, the same? Yes. Family Medical Leave Act provides for back pay, front pay, and possible double damages in the case of a willful violation of the law being found. So just to reiterate. You're not asking for her job back. The job's gone. No, we're not asking for the job back at this point. But just to reiterate, they've brought up at this point this issue of a hiring freeze. I would even point to the fact that a month later, another employee was hired to the Trim and Upholstery Department. Yeah, but it's a different department. Different department, but it is curious if there's a hiring freeze, that it just so happens it affects Mrs. Lupien, and then a month later they're bringing in a new employee. To me, a hiring freeze would indicate that regardless, they're not going to be hiring for other departments. Well, it could be a department-wide hiring freeze. That's the way I interpreted that. Nevertheless, our position is that the employer itself has created a number of question of facts for the jury as to why she actually would let go. Is Mrs. Lupien currently employed? She is not at this point, no. But the issue, again, would be was she terminated when the leave expired? Well, we have the school president saying, well, no, she was a returning employee. So this whole issue of how somebody can be fired pursuant to a hiring freeze when they're a current employee is certainly something that a jury is going to have to parse through. So that's all I have in regard to the retaliation argument. Okay, thank you. Can we just see counsel for a second? Do you want to come on up? Mr. Blakey, do you want to come on up? Thank you. Thank you. She doesn't have to be certified. A little bit of confirmation of that. Yeah. Yeah. That's a wise answer, sir. Thank you.  Thank you. Thank you. Thank you.